COUNTY OF HAWAII, a municipal corporation, Plaintiff-Appellee, *v.* JOSEPH YUKI SOTOMURA, GRACE FUMIYE SOTOMURA; et al., Defendants-Appellants

NO. 5281

DECEMBER 11, 1973

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON AND KOBAYASHI, JJ.

OPINION OF THE COURT BY RICHARDSON, C.J.

This case arises as an appeal from eminent domain proceedings initiated by plaintiff-appellee County of Hawaii on July 7, 1970, in the acquisition of a park site at the Kalapana Black Sand Beach, a unique tourist attraction and surfing spot on the Island of Hawaii. Defendants-appellants contest the trial court's valuation of the subject property. At issue are the court's location of the seaward boundary of the subject property and the method of valuation.

The subject property, described by the County as "Lot 3, Land Court Application 1814," is a portion of a 62 acre parcel divided by defendants' predecessors in title into three lots. Lot 1 of Land Court Application 1814 is a 56 acre parcel mauka (inland) of the Puna Coast Road; Lot 2 is the Puna Coast Road running through the property, and Lot 3 is a long, narrow parcel of land bordered on one side by the Puna Coast Road and on the other by the sea. The seaward (makai)

boundary of Lot 3 is described in the application as:

. . . to a △ cut in pahoehoe at high water mark at sea-shore;

Thence *following along the seashore in all its windings along high water mark,* the direct azimuths and distances between points at high water mark for the next four courses being:

12. 338° 50' 30"  538.24 feet to a spike;
13. 25° 17'  411.24 feet to a spike;
14. 56° 05'  610.84 feet to a spike;
15  60° 44'  340.38 feet to the point of beginning [a pipe] and containing an area of 5.314 acres (emphasis added).

Defendants first argue that the location of the seaward boundary as previously determined by the land court is conclusive; hence the trial court erred in finding that the boundary had moved further mauka due to erosion, and in dividing the property accordingly for purposes of valuation. Second, defendants contend that a valuation based on highest and best use should include consideration of the conjunctive use of the subject property with Lot 1, an adjacent parcel under common ownership.

We reverse and remand for further proceedings in accordance with instructions set forth herein.

I

Defendants-appellants contend that the seaward boundary of Lot 3 is presumed to be at the same location today as it was when the property was registered in the land court in 1962. They argue that because land court proceedings are *res judicata* and conclusive against all persons as to the boundary determination, the certificate of registration shall be conclusive evidence of the location of the seaward boundary.[1]

---

[1] HRS § 501-71 provides in pertinent part:

Every decree of registration of absolute title shall bind the land, and quiet the title thereto, subject only to the exceptions stated in section 501-82. It shall be conclusive upon and against all persons, including the State, . . . . The decree

The surveyor, who had prepared the survey for defendants' predecessors' application in 1959, testified at the jury-waived trial that he had located the high water mark along the limu line.[2]

The county disputed the location of the high water mark and the seaward boundary of Lot 3, arguing that erosion[3] to the subject parcel had occurred since the land court had approved the survey. In 1969, prior to the initiation of this eminent domain proceeding, the county surveyor prepared a survey in which he located the seaward boundary pursuant to the decision of this court in *In re Application of Ashford*, 50 Haw. 314, 315, 440 P.2d 76, 77 (1968), that the seaward boundary between private upland and public beach is "along the upper reaches of the wash of waves, usually evidenced by the edge of vegetation or the line of debris . . . ." At trial, the county surveyor testified that to locate the boundary, he determined the upper reaches of the wash of waves to be along the debris line,[4] which was further mauka than the limu line.

---

shall not be opened by reason of the absence . . . of any person affected thereby, nor by any proceeding for reversing judgments or decrees . . . .

HRS § 501-88 provides that

*Certificate as evidence.* The original certificate in the registration book, any copy thereof duly certified under the signature of the registrar or assistant registrar, and the seal of the court, and also the owner's duplicate certificate, shall be received as evidence in all the courts of the State and shall be conclusive as to all matters contained therein, except as otherwise provided in this chapter.

[2]Defendants' surveyor testified:

Q Well, how did you affix the seaward boundary or the high-water mark boundary to this particular Lot 3, sir?

A Well, we more or less adopted the — we call it the limu line or the seaweed line. That's the growth of the limu along the seashore and we followed that particular line as closely as possible and took measurements with a transit and a stadia rod to determine the meanderings of this seashore.

[3] Erosion has been defined as "the gradual and imperceptible wearing away of land by the natural action of the elements." In re City of Buffalo, 206 N.Y. 319, 324, 99 N.E. 850, 852 (1912).

[4] The county surveyor testified:

A Usually we look where the wash is, where the debris —
Q The debris?
A Yeah.
Q The wash of the waves?
A Yeah.

Court was convened at the subject property on November 8, 1971, for the purpose of inspecting the limu line, the vegetation line, and the debris line. Following this inspection, the court found that Lot 3 had eroded so that the seaward boundary was now further inland than the high water mark shown on the land court application. Agreeing with the county surveyor, the court applied the *Ashford* definition to locate the new boundary along the debris line.[5] Before we reach the question of whether the trial court properly located the seaward boundary, we must first determine whether the court properly considered and found erosion.

II

Although Rule 26, Rules of the Land Court provides for registration of title to accretion to previously registered land, neither HRS Chap. 501 Land Court Registration nor the Rules of the Land Court provide for registration of a change in the location of a seaward boundary which has been altered by erosion. We cannot assume that the silence of the statute or the rules is an expression of intent to foreclose the state or county from challenging the title to newly-eroded tidelands.

We hold that registered ocean front property is subject to the same burdens and incidents as unregistered land, including erosion. HRS § 501-81. Thus the determination of the land court that the seaward boundary of Lot 3 is to be located along high water mark remains conclusive; however, the precise location of the high water mark on the ground is subject to change and may always be altered by erosion.

---

[5] Finding of Fact No. 6 states:

That there has been erosion along the seaward boundary so that the seaward boundary, according to *In re Application of Ashford*, 50 Haw. 314 (1968), would be further inland. The survey made by Mr. Kaloi properly indicates the point at which the work of the elements, waves, winds, has taken its toll to erode the land so that following the *Ashford* case "the upper reaches of the wash of the waves as evidenced by the line of debris" would establish the metes and bounds description of the subject property remaining above the line established by the *Ashford* case, as . . . hereinafter referred to as Lot 3A. The acreage in Lot 3A is 4.194 or 182,691 square feet.

This court recently rejected the position that the state cannot subsequently challenge title to registered land where the state later discovered that the seaward boundary was located further mauka than shown on the maps, and a portion of the property had become submerged by erosion. In *In re Application of Castle,* 54 Haw. 276, 277, 506 P.2d 1, 3 (1973), we permitted the state to dispute the location of a boundary similarly described as "at high water mark" on the map accompanying a certificate of title, because a recent survey prepared by the state showed that "the present seashore boundary of these lots are further mauka (inland) than the high water mark shown on this map."

Our holding in *Castle* permits a court to determine questions of erosion in whatever form they arise. The trial court in the instant case could have suggested that the boundary issue be litigated in the land court before deciding the issue of valuation. See *Re Land Title, State of Hawaii,* 49 Haw. 537, 544, 425 P.2d 83, 88, *rehearing denied,* 49 Haw. 575, 425 P.2d 83, 102 (1967). The trial court was under no compulsion to do so, however. We hold that the questions of erosion and boundary location were properly before the trial court and now are properly before this court for review.

The finding that erosion had occurred is a finding of fact that should not be "set aside unless clearly erroneous."[6] H.R.C.P., Rule 52(a). *Low v. Honolulu Rapid Transit,* 50 Haw. 582, 586, 445 P.2d 372, 376 (1968).

III

Having concluded that the trial court properly determined that the seaward boundary had been altered by erosion and the location of the high water mark has shifted, we now hold that the new location of the seaward boundary on the ground, as a matter of law, is to be determined by our decision in *In re Application of Ashford, supra.*

The *Ashford* decision was a judicial recognition of

---

[6] We take judicial notice of the fact that the U.S. Army Corps of Engineers is currently planning to build a 1400 foot breakwater to prevent further erosion of the black sand beach at Kaimu.

long-standing public use of Hawaii's beaches to an easily recognizable boundary that has ripened into a customary right. *Cf. State ex rel. Thornton v. Hay,* 254 Or. 584, 462 P.2d 671 (1969). Public policy, as interpreted by this court, favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible.

The trial court correctly determined that the seaward boundary lies along "the upper reaches of the wash of waves." However the court erred in locating the boundary along the debris line, rather than along the vegetation line.

We hold as a matter of law that where the wash of the waves is marked by both a debris line and a vegetation line lying further mauka; the presumption is that the upper reaches of the wash of the waves over the course of a year lies along the line marking the edge of vegetation growth. The upper reaches of the wash of the waves at high tide during one season of the year may be further mauka than the upper reaches of the wash of the waves at high tide during the other seasons. Thus while the debris line may change from day to day or from season to season,[7] the vegetation line is a more permanent monument, its growth limited by the year's highest wash of the waves.

We remand this case and direct that the trial court locate and establish the seaward boundary of Lot 3 along the vegetation line as of the date of summons.

IV

The trial court divided Lot 3 into two parcels: Lot 3A, that portion of Lot 3 mauka of the *Ashford* seaward boundary line, with an area of 4.194 acres, and Lot 3B, that portion of Lot 3 makai of the *Ashford* seaward boundary line but mauka of the 1960 limu line, with an area of 1.120 acres. The trial court found that Lot 3B had no market value, but awarded

---

[7] The county surveyor testified at trial:
Q So the debris line would remain the same day after day?
A No.
Q It changes, right?
A Correct.

defendants $1.00 as just compensation for the taking.[8] Defendants contend that the division into two separate parcels for valuation was erroneous and that the area of 5.314 acres remains unchanged; the county replies that because defendants did not object to these findings at trial, they may not do so on appeal. *Lindeman v. Raynor,* 43 Haw. 299 (1959).

We find neither argument persuasive, and we reverse this finding of the trial court. First, we reverse the calculation of the area of Lots 3A and 3B, because the location of the *Ashford* seaward boundary line was erroneous. Second, although we uphold the division of Lot 3 into two separate parcels, we reverse the award of $1.00 for land which does not belong to defendants.

In *Halstead v. Gay,* 7 Haw. 587, 590 (1889), we held that

. . . land now above high-water mark, which has been formed by imperceptible accretion against the shore line existing at the date of the survey and grant, has become attached by the law of accretion to the land described in the grant.

We have never ruled on the question of whether title to land lost by erosion passes to the state. In the absence of kamaaina testimony or other evidence of Hawaiian custom relevant to the question, we resort to common law principles:

The loss of lands by the permanent encroachment of the waters is one of the hazards incident to littoral or riparian ownership. . . . [W]hen the sea, lake or navigable stream gradually and imperceptibly encroaches upon the land, the loss falls upon the owner, and the land thus lost by erosion returns to the ownership of the state. *In re City of Buffalo,* 206 N.Y. 319, 325, 99 N.E. 850, 852 (1912).

We find another line of cases persuasive to determine this question. Land below the high water mark, like flowing water, is a natural resource owned by the state "subject to,

---

[8] Finding of Fact No. 7 states:

The just compensation for the taking of a portion of the subject land below, makai, and seaward side of the Ashford seaward boundary, Lot 3B, and which amounts to 1.120 acres or 48,787 square feet is $1.00 for the total area. This Court finds and concludes that the area below the Ashford line has no market value, except for $1.00, and further because of the operation of the law in the Ashford case it has no value to the defendants.

but in some sense in trust for, the enjoyment of certain public rights.'' *Bishop v. Mahiko,* 35 Haw. 608, 647 (1940). The public trust doctrine, as this theory is commonly known, was adopted by this court in *King v. Oahu Railway & Land Co.*, 11 Haw 717 (1899). In that case we adopted the reasoning of the United States Supreme Court in *Illinois Central R.R. v. Illinois,* 146 U.S. 387 (1892), holding that title to land below the high water mark was:

> ... different in character from that which the state holds in lands intended for sale .... It is a title held in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties .... The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. *King v. Oahu Railway & Land Co.,* 11 Haw. at 723-24.

We hold that the land below the *Ashford* seaward boundary line as to be redetermined belongs to the State of Hawaii, and the defendants should not be compensated therefor.

V

The trial court valued Lot 3A, that portion of Lot 3 lying mauka of the Ashford seaward boundary line, at $1.20 per square foot, for a total of $219,229.20. The court based this valuation on evidence in the record supporting a finding that the property was best suited for public park purposes. The state land use commission had placed the parcel in the conservation district, and the county had zoned the property "open" and in its general plan designated Lot 3 for park development.

Defendants contend that Lot 3 must be valued at the "highest and best use" to which the property may reasonably be put. They urge that the "highest and best use" of Lot 3

would be in conjunction with use of Lot 1, property under common ownership lying mauka of the Puna Coast Road. That parcel, which the state land use commission has placed in the urban district, has been zoned R-5-A, residential-agriculture and designated for resort-hotel use in the general plan by the county. Defendants argue that since the proposed conjunctive use of the property was feasible, *i.e.*, by building the resort's swimming pool on Lot 3, the trial court should have given weight to this consideration in determining the fair market value of the property. Taking into consideration a use in conjunction with the mauka parcel for resort purposes, defendants' appraisers established a valuation of Lot 3 ranging between $2.24 and $4.00 per square foot.

We held that consideration of conjunctive use in valuation is proper in *City and County v. Collins*, 42 Haw. 199, 217-18 (1957), quoting with approval the opinion of Mr. Justice Butler in *Olson v. United States*, 292 U.S. 246, 255-56 (1934):

Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined. The sum required to be paid the owner does not depend upon the uses to which he has devoted his land but is to be arrived at upon just consideration of all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held. The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value. Nor does the fact that it may be or is being acquired by eminent domain negative consideration of availability for use in the public service. (Citations omitted.)

The trial judge must determine whether it appears likely that conjunctive use of the subject parcel will occur in the

reasonably near future:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value — a thing to be condemned in business transactions as well as in judicial ascertainment of truth. *Olson v. United States*, 292 U.S. 246, 257 (1934).

Under the above standard, the trial court properly excluded consideration of conjunctive use in considering just compensation. There is nothing in the record to support a conclusion that a market for the use proposed by the defendants was reasonably probable at the time of the taking.

The state and county governments have, for almost 15 years, designated the Kalapana-Kaimu community as a potential recreation-resort center. However, in the development plans admitted in evidence, the government agencies have proposed the acquisition of Lot 3 as a viewpoint and picnic facility.[9] Defendants' witness Robert Bush, who prepared a study of development feasibility for defendants in 1970, testified that the timing for a proposed resort development was "delayed several years" at the time of trial.[10]

Although we reverse the award of $219,229.20 as based on an erroneous calculation of area, we find no error in the valuation of Lot 3 for park purposes at $1.20 per square foot.

---

[9] Belt, Collins & Assoc., *A Plan for the Metropolitan Area of Hilo* 52-55, 1961; County of Hawaii, *Kalapana-Kaimu Park Development Plans* (1969).

[10] Q . . .
Mr. Bush, do you think it would be feasible as of July 7, 1970 to interest a hotel developer into proceeding with the immediate construction of a project of this nature?

A Well, at the time we were completing these studies, it is my understanding that there were several developers interested in talking with the owners. I think that it might have been possible at that time to enter into some kind of a development agreement. I would think that since the extensive development of hotel rooms throughout the State that the timing is probably delayed several years at this point. But it ultimately has great potential in this area, particularly as it ties in with the expansion and really full development of the Hilo possibilities, of tying in with Hilo-Volcano-Kalapana.

Absent a showing by defendants that a demand existed for the proposed use of Lot 3A in conjunction with the mauka parcel for resort purposes in the reasonably near future, we must sustain the trial court's rejection of defendants' plan as a factor in the determination of the fair market value of Lot 3.

## VI

The decision of the trial court is reversed and remanded for a relocation of the seaward boundary of Lot 3 along the upper reaches of the wash of waves as evidenced by the vegetation line, and a recalculation of the area of the subject property. That portion of Lot 3 lying makai of the vegetation line is held to be the property of the state, and defendants are not entitled to compensation for the taking of this portion of the property. That portion of Lot 3 mauka of the vegetation line is to be valued at $1.20 per square foot as just compensation for the taking.

*Charles W. Key (Damon, Shigekane, Key & Char* of counsel) for defendants-appellants *Joseph Yuki Sotomura* and *Grace Fumiye Sotomura.*

*Masanori Kushi* for defendants-appellants *Robert Mitsugi Yamada,* et al.

*Richard T. Ishida,* Special Counsel, and *Clifford H. F. Lum,* Corporation counsel, County of Hawaii, plaintiff-appellee.

### CONCURRING AND DISSENTING OPINION OF MARUMOTO, J.

I concur in the holding in Part V of the foregoing opinion of the court sustaining the determination of the circuit court that, for the purpose of arriving at the amount of just compensation to be paid in this case, Lot 3 had a value of $1.20 per square foot.

I also concur in the holding in Part IV of the opinion that the circuit court erred in awarding even a nominal amount to defendants for the portion of the area lying between the seaward boundary described in the land court decree and the line to which the seaward boundary moved inland by erosion

inasmuch as such area became the property of the State when erosion took place.

In Part II of the opinion, it is stated: "We hold that registered ocean front property is subject to the same burdens and incidents as unregistered land, including erosion. HRS § 501-81. Thus the determination of the land court that the seaward boundary of Lot 3 is to be located along high water mark remains conclusive; however, the precise location of the high water mark on the ground is subject to change and may always be altered by erosion."

I concur in that holding, subject to the following caveat: The wording of the holding is ambiguous because there is an ambiquity in the statement "the determination of the land court that the seaward boundary of Lot 3 is to be located along high water mark remains conclusive." In the land court decree in this case, the seaward boundary was not described generally as being along the high water mark but was specifically located by metes and bounds. Thus, I read the holding to mean that the seaward boundary specifically delineated in the decree remained conclusive, until a change in the line was established by proof of erosion.

My concurrence in the holding does not mean that I consider a final land court decree of registration of oceanside land not to be res judicata with respect to the delineation therein of the seaward boundary of the land.

A land court decree, which has not been appealed and has therefore become final, is res judicata.

In every land court decree, HRS § 501-81 is impliedly incorporated as a part thereof. HRS § 501-81 provides: "Registered land, and ownership therein, shall in all respects be subject to the same burdens and incidents which attach by law to unregistered land." Accretion and erosion are incidents which attach by law to unregistered land.

Thus, in the case of a land court decree, the doctrine of res judicata applies to the decree with the provision of HRS § 501-81 read into it by implication.

I think that, from the res judicata nature of a land court decree as stated above, where the seaward boundary of the registered land is described in the decree, the boundary must

be presumed to remain along the described line, until a subsequent change is established by proof of accretion or erosion, the burden of proof of accretion being on the landowner and the burden of proof of erosion being on the State.

Turning now to dissent, I dissent from the holding in Part III of the opinion that *"as a matter of law * * ** where the wash of the waves is marked by both a debris line and a vegetation line lying further mauka, the presumption is that the upper reaches of the wash of the waves over the course of a year lies along the line marking the edge of vegetation growth,"* and that the seaward boundary of Lot 3 be established along the vegetation line. (Emphasis supplied)

In so dissenting, I will not indulge in an extensive dissertation against the holding, for to do so will be but an exercise in futility. I merely point out that, in my opinion, the holding is plain judicial law-making. That is apparent from the quoted statement in the opinion that the holding is being made "as a matter of law," and from the following reason given therefor: *"Public policy, as interpreted by this court,* favors extending to public use and ownership as much of Hawaii's shoreline as is reasonably possible."* (Emphasis supplied)

In connection with such judicial law-making, I quote the following statement of Dean Roscoe Pound, which deserves more than a passing notice:

"It must be remembered that any attempt to set up new premises on a large scale by judicial lawmaking unduly impairs the stability of the legal and so of the economic order, since judicial lawmaking is retroactive whereas normally legislation prescribes for the future." II Pound, Jurisprudence 453 (1959).