In the Matter of the Application of WALTER FOSS SANBORN to register title to real property situate at Hanalei, Halelea, County of Kauai, State of Hawaii

NO. 5553

MARCH 23, 1977

RICHARDSON, C.J., KOBAYASHI, OGATA,
AND MENOR, JJ., AND CIRCUIT JUDGE
KATO, IN PLACE OF KIDWELL, J., RECUSED

586

OPINION OF THE COURT BY RICHARDSON, C.J.

This is an appeal by the State Land Surveyor (hereinafter, State Surveyor or Surveyor) from a decree and order of the land court determining the location of two lines, the beachfront title line and the "shoreline" of registered land owned by appellees Sanborn *et al.* (hereinafter, the Sanborns). The decree and order commanded the Surveyor to certify to the Kauai planning commission a map on which these two lines are drawn in accordance with the court's determination.

The case arose out of the Sanborns' attempt to obtain Kauai County approval of a subdivision of a beachfront lot into two smaller lots. It is agreed that under Kauai County rules and regulations implementing the state shoreline set-back act, HRS §§ 205-31 through 205-37 (1975 Supp.), the Sanborns were required to submit to the Kauai planning department a map of the property, certified in part by the

State Surveyor. When the Surveyor refused to certify a map prepared by the Sanborns, they brought this action.

Neither the Sanborns nor the Surveyor has introduced in evidence the applicable Kauai County rules and regulations, so that, on the record before this court and the land court, it is unclear which aspects of the Sanborns' map the Surveyor was required to certify. The state shoreline setback act, *supra,* does not itself require the preparation of any maps or their certification by the Surveyor. The state act delegates to the county planning commissions the duty to enforce the setback law, and to implement it by promulgating rules and regulations. HRS § 205-32.

HRS § 622-13 (1975 Supp.) limits the power of our courts to take judicial notice of county ordinances and regulations. See *State v. Shak,* 51 Haw. 626, 466 P.2d 420 (1970); *State v. Tamanaha,* 46 Haw. 345, 379 P.2d 592 (1963); and *Territory v. Yoshikawa,* 41 Haw. 45 (1955). Although HRS § 622-13(c) has, since 1972, permitted judicial notice of county ordinances under certain specified conditions, such conditions are not present in this case.

Despite the fact that the original dispute between the parties was limited to whether the State Surveyor was required to certify the Sanborns' map — an issue which arguably could have been resolved without determining the Sanborns' beachfront title line — at trial the parties devoted most of their attention to the determination of this line. On appeal, the sole issue is the title line. (The Surveyor's opening brief fails to specify as error the trial court's determination of the Sanborns' "shoreline" for purposes of the shoreline setback act).

In land court there are no pleadings in the ordinary sense of the word. Accordingly, there was no opportunity to clarify pleadings once the parties proceeded to litigate the issue of the Sanborns' title line.

The land court did have jurisdiction to entertain both the "shoreline" and title line issues, either under Hawaii's

declaratory judgment act,[1] or under HRS § 501-85, which requires land court approval of subdivisions of registered land,[2] or under HRS § 501-64, which gives the land court full power to enforce its decrees, including of course the 1951 decree which registered title to the Sanborns' lot.

## THE BEACHFRONT TITLE LINE

In addressing the issue of the Sanborns' beachfront title line, the primary question is whether the line is to be determined according to Hawaii's general law of ocean boundaries, or whether certain distances and azimuths contained in the Sanborns' 1951 land court decree of registration are to prevail.

The law of general application in Hawaii is that beachfront title lines run along the upper annual reaches of the waves, excluding storm and tidal waves. *County of Hawaii v. Sotomura*, 55 Haw. 176, 181-82, 517 P.2d 57, 61-62 (1973).

In the instant case, after extensive testimony the land court determined that a certain line, the "Edge of Vegetation and Debris Line" (hereinafter, "vegetation and debris line"), as drawn on a map of the Sanborns' property, represents

> the 'upper reaches of the wash of waves' during ordinary high tide during the winter season, when the . . . waves are further mauka (or inland) than the highest wash of waves during the summer season.

Decree and Order dated June 29, 1973, at 3.

---

[1] HRS § 632-1 *et seq.* (1975 Supp.). The first paragraph of § 632-1 empowers "courts of record" to grant declaratory judgments. Although the second paragraph of the section arguably limits declaratory judgments to "civil cases", there is no indication that "civil" here means anything more than "non-criminal".

[2] § 501-85 and Land Court Rule 15 contemplate the filing of petitions to subdivide, including submission of maps verified by the State Surveyor. In *In re Application of Castle*, 54 Haw. 276, 506 P.2d 1 (1973), the issue of a beachfront title line came before the court after such a petition had been filed and the Surveyor had refused to verify petitioner's map. In the instant case, however, the record does not show any such petition. Apparently the Sanborns were waiting for Kauai County approval before filing a formal petition in land court.

This description of the "vegetation and debris line" reflects the law of general application respecting beachfront title boundaries in Hawaii. *Sotomura, supra,* 55 Haw. at 182, 517 P.2d at 62. However, even though the decree discusses and fixes the location of this line with respect to the Sanborns' property, the decree denies legal significance to it in this particular case, instead finding that the Sanborns' beachfront title line is fixed by certain distances and azimuths set out in the 1951 land court decree registering title to the property.

Through an apparent oversight, the 1951 decree has not been designated part of the record on appeal. Nevertheless, that decree is one of the original papers in Land Court Application No. 1578 (the instant case), and therefore, pursuant to HRCP Rule 75(a), which is made applicable to land court appeals by HRCP Rule 81(f), the 1951 decree is part of the record on appeal.

The 1951 decree provides in pertinent part that the Sanborns' property is

more particularly bounded and described as follows:

\* \* \* \*

Beginning at an "——→" cut in concrete . . . and running by azimuths measured clockwise from True South:

\* \* \* \*

2.  134° 55′   162.00 feet . . . to high water mark at seashore . . .
3.  Thence following along high water mark at seashore, the true azimuth and distance being 221° 39′ 30" 233.36 feet. . . .

When the distances and azimuths of this description are plotted on a map of the Sanborns' property, they give a line approximately 40 to 45 feet makai (seaward) of the "vegetation and debris line".

It is undisputed that during the course of the year actual high water mark varies, with ordinary winter tides reaching

substantially further mauka than ordinary summer tides, primarily due to the washing out of beach sands during the winter months. However it is also undisputed that, because of the annual return of sands during the summer months, there has been no substantial *permanent* erosion of the Sanborns' beach since 1951.[3]

The court below held that, because there has been no permanent erosion since 1951, the State is bound by the measurements in the 1951 decree. We reverse. We hold that, regardless of whether or not there has been permanent erosion, the Sanborns' beachfront title boundary is the upper reaches of the wash of waves. Although we find that the State is bound by the 1951 decree to the extent that the decree fixes the Sanborns' title line as being "along the high water mark at seashore", we also find that the specific distances and azimuths given for high water mark in 1951 are not conclusive, but are merely prima facie descriptions of high water mark, presumed accurate until proved otherwise.[4] The evidence adduced at trial below established that the 1951 measurements do not reflect (and given the lack of permanent erosion, probably never reflected) the upper reaches of the

[3] The most likely explanation for the discrepancy between the distances and azimuths set out in 1951 and the "vegetation and debris line" determined below is that the 1951 measurements reflect high water mark at some time during the summer season, while the "vegetation and debris line" reflects the "'upper reaches of the wash of waves' . . . during the winter season, when the . . . waves are further mauka". Decree and Order, June 29, 1973, *supra*.

[4] This distinction between high water mark (the operative legal standard) and specific distances and azimuths (prima facie descriptions of high water mark) is consistent with *County of Hawaii v. Sotomura, supra,* wherein a similar land court decree had located the beachfront title line "along the high water mark" and had also described the line by distances and azimuths. *Sotomura* held that "the determination of the land court that the seaward boundary . . . is to be located along high water mark remains conclusive; however, the precise location of the high water mark on the ground is subject to change and may always be altered by erosion." 55 Haw. at 180, 517 P.2d at 61.

Appellees read this language as implying that azimuths and distances are conclusive in all cases except where there has been permanent erosion. Such a reading is not the most natural reading of the above language.

wash of waves. Rather, the trial court made the finding of fact that the "vegetation and debris line" represents the upper reaches of the wash of waves. Such finding was not clearly erroneous. Accordingly, the "vegetation and debris line" represents the Sanborns' beachfront title line.

## THE LAND COURT STATUTE

HRS § 501-71 provides:

> Every decree of registration of absolute title shall bind the land, and quiet the title thereto, subject only to the exceptions stated in section 501-82. It shall be conclusive upon and against all persons, including the State . . . .

The Sanborns contend that this section gives binding effect to the specific distances and azimuths set out in the 1951 decree for the line of high water. The Sanborns' unstated assumption is that the above section gives conclusiveness (subject to the exceptions in § 501-82, which are not relevant to this case) to every azimuth and distance in a land court decree, no matter what kind of boundary is being described. The literal language of the statute and prior judicial construction of this and related statutes fail to uphold appellees' assumption.

Literally, § 501-71 states in general terms that a land court decree of registration shall bind the land and be conclusive. The section does not say that every aspect of a land court decree is always conclusive.

The underlying purpose of land court registration under the Torrens system is to afford certainty of title, but it is unrealistic to expect the system to afford absolute certainty. Our statute explicitly states certain exceptions to the conclusiveness of land court decrees, both in HRS § 501-82 and in HRS § 501-71, *supra* (in a portion of the statute not given above). Such stated exceptions are not necessarily the sole limitations upon a Torrens decree of registration. For example, in *Baart v. Martin*, 99 Minn. 197, 108 N.W. 945 (1906), the court found an implied exception to the Minnesota

Torrens statutes, which then provided, in language similar to the above language of HRS § 501-71:

> Except as herein otherwise provided, every decree of registration shall bind the land described therein, and shall forever quiet the title thereto, and shall be forever binding and conclusive upon all persons . . . and such decree shall not be opened, vacated or set aside . . . by any proceeding at law or in equity . . ., except as herein especially provided.

Rev. Laws of Minnesota 1905 § 3390.

The Minnesota statute (unlike Hawaii's) contained no provision for setting aside fraudulently obtained decrees of registration. Despite the statute's explicit provision that a land court decree "shall not be . . . set aside . . . by any proceeding at law or in equity . . . except as herein expecially provided", the Minnesota supreme court in *Baart* affirmed the trial court's setting aside of a prior decree of registration that had been obtained by fraud. The court in *Baart* held that general equitable principles created an implied exception to the statute. 99 Minn. at 211-12, 108 N.W. at 951.

Similarly, in *Swan Island Club v. Yarbrough*, 209 F.2d 698 (4th Cir. 1954), the U.S. Court of Appeals read into the North Carolina Torrens Act an exception based on public policy. *Swan Island* arose out of a trespass dispute between a private club and certain hunters who had placed duck blinds over underwater shoal lands allegedly owned by the club. These shoal lands were within the jurisdiction of the state of North Carolina, and the court applied North Carolina law. The lower court had found that although the relevant shoal waters were shallow, they qualified as "navigable waters" under North Carolina law, because flat bottom boats could navigate the waters under most conditions. *Swan Island Club v. White*, 114 F. Supp. 95 (E.D.N.C. 1953). It was undisputed that the alleged trespasses occurred within the boundaries of land registered by the club in a 1927 North Carolina Torrens proceeding. The decree of registration had been based on several old grants from the state, buttressed by a recent

boundary agreement between the club and the state. *Id*. The Court of Appeals found:

It is the law of North Carolina, as it is of the majority of the states where the question has been raised, that the title to lands under navigable waters is held by the state in trust for the use of the public and grants for such lands have been forbidden throughout the state's history.

*Swan Island Club v. Yarbrough, supra,* 209 F.2d at 699-700. After citing various North Carolina cases and a United States Supreme Court case standing for the proposition that lands under navigable waters are held in trust for the public by the state, the court concluded:

In the light of the public policy thus declared, we do not think that the legislature of the state in the passage of the Torrens Act . . . could have intended that title should be vested by a judgment . . . with respect to land under navigable waters . . . [I]t is but reasonable to read into [the Torrens Act] an exception with respect to lands lying under navigable waters. . . .

The purpose of a proceeding under the Torrens law is to remove clouds from title and resolve controversies with regard thereto, not to validate title to lands which under the law of the state . . . are not subject to private ownership.

*Id.* at 701-02.

In Hawaii, the public trust doctrine, recognized in our case law prior to the enactment of our land court statute,[5] can similarly be deemed to create an exception to our land court statute, thus invalidating any purported registration of land below high water mark. Although the instant case is decided on narrower grounds, *infra,* we approve this court's analysis in *Sotomura, supra,* 55 Haw. at 183-84, 517 P.2d at 63, where it is stated, with reference to land courted property, that land below high water mark is held in public trust by the State,

---

[5] King v. Oahu Ry. & Land Co., 11 Haw. 717 (1899), acknowledged that the public trust doctrine is applicable to Hawaii. Hawaii's land court statute (Torrens act) was first enacted in 1903. S.L.H. 1903 c. 56.

whose ownership may not be relinquished, except where relinquishment is consistent with certain public purposes. Under this analysis, any purported registration below the upper reaches of the wash of waves in favor of the appellees was ineffective.[6]

However, the decision in this case does not depend upon application of the public trust doctrine. This case can be resolved under the more limited principles (1) that in construing land court decrees, as in construing written instruments generally, natural monuments such as "along high water mark" control over distances and azimuths and (2) that the true measure of high water mark in this jurisdiction is the upper reaches of the wash of the waves.

---

[6] In *King v. Oahu Ry.*, *supra*, it was recognized that lands under navigable waters are held in public trust by the sovereign. *Oahu Ry.* did not define the upper boundary of the public trust domain, *i.e.*, whether the boundary is high or low water mark. Cases from other jurisdictions are divided. Part of the confusion appears to stem from a changing definition of "navigable waters", which originally were defined as tidewaters — waters in which the ocean ebbs and flows. 78 Am. Jur. 2d Waters § 60. Subsequently, in deference to America's extensive inland (non-tidal) rivers, the definition of navigable waters in America was extended to include any waters that are "navigable in fact". *Id.* Under the original tidewater definition, it is natural to think of navigable waters as extending to high water mark, because the ebb and flow of the tides of course extends to high water mark. Thus

[a]t common law, although . . . there was some divergence of view, the title to all land under tidal waters below high water mark belonged to the Crown . . . [and was] held by the king in trust for the use of all his subjects.

Hayes v. Bowman, 91 So.2d 795, 799 (Fla. 1957).

Under the newer phrase "navigable in fact", it may seem less obvious that navigable waters extend to high water mark.

Without engaging in an exhaustive inventory of the cases, it appears that the majority of jurisdictions considering the issue have found that the public trust domain (at least for tidal areas) extends to high water mark. *See, e.g.*, Rochester v. Barney, 117 Conn. 462, 468, 169 A. 45, 47 (1933); State v. Hooper, 3 Conn. Cir. Ct. 143, 209 A.2d 539 (1965); Hayes v. Bowman, 91 So.2d 795, 799 (Fla. 1957); Adams v. Elliott, 128 Fla. 79, 86-87, 174 So. 731, 734 (1937); Treuting v. Bridge & Park Comm'n, 199 So.2d 627, 632-33 (Miss. 1967). *See also* cases finding that private individuals may own waterfront land as far down as low water mark, but that the strip of land between low and high water mark (the "foreshore") is nevertheless subject to a continuing public right of navigation, fishing and related usages, *e.g.*, State v. Cockrell, 162 So.2d 361 (La. App. 1964); Shaffer v. Baylor's Lake Ass'n, 392 Pa. 493, 141 A.2d 583 (1958).

In *McCandless v. Du Roi*, 23 Haw. 51 (1915), this court stated that land court decrees are subject to the same rules of construction generally applicable to deeds and that therefore, in construing a land court decree, "'course and distance will yield to known visible and definite objects whether natural or artificial.'" 23 Haw. at 54. More specifically, the *McCandless* court found that a land court decree's description by distances and azimuths of certain points along the course of an 'auwai (ditch) was not conclusive in a subsequent land court proceeding. The original land court decree in *McCandless* had located four exact points along the bank of the 'auwai. The decree reads in part:

'5.   276° 10' 56.1 feet along land described in L. C. Award 1127, Ap. 2, the south bank of the auwai being the boundary.

'6.   295° 15' 35.6 feet along the south bank of the auwai.

'7.   265° 56' 54.2 feet along the south bank of the auwai.'

23 Haw. at 52.

In a boundary dispute subsequent to the original decree, the land court found that the south bank of the 'auwai had not changed its location since the decree was first entered and that the points set out in the decree were not in fact coincident

---

*Sotomura, supra,* aligns itself with the majority in expressly stating that land below high water mark is owned by the State in trust for the public.

*Sotomura* cites Bishop v. Mahiko, 35 Haw. 608 (1940) for the proposition that land below high water mark is held in trust by the State. In clarification of this citation, it should be stated that *Mahiko* is inconclusive, but *Mahiko* does recognize that the public trust domain *may* extend to high water mark. Several authorities quoted in *Mahiko* indicate that the public trust domain extends to high water mark, although one quoted authority states that the domain extends to low water mark.

Territory v. Liliuokalani, 14 Haw. 88 (1902) found that King Kamehameha V had the power in 1866 to convey to a private individual a parcel of land extending down to low water mark. However, Brown v. Spreckels, 14 Haw. 399, 404 (1902), *aff'd,* 212 U.S. 208 (1909), indicates that *Liliuokalani* may apply only to grants under the monarchy, and that since annexation any purported conveyance of land below high water mark to private individuals may be invalid. (It should be added that *Spreckels* incorrectly cites *Oahu Ry. & Land Co., supra,* for the proposition that during the monarchy land extending down to low water mark could be conveyed to private individuals).

with the actual south bank of the 'auwai (being up to 1.7 feet away from the south bank). The land court held that the operative boundary was the actual south bank of the 'auwai, not the lines given by distances and azimuths. On appeal this court affirmed, over a dissent by Justice Quarles in which some of the arguments presently advanced by the Sanborns were raised. The majority found that the distances and azimuths plotted a meander line — a rough guideline, not a boundary line. "'It has been decided again and again that the meander line is not a boundary, but that the body of water whose margin is meandered is the true boundary.'" 23 Haw. at 56.

We follow *McCandless*, finding that in the 1951 decree the natural monument "along high water mark" controls over the specific distances and azimuths. We further find that the true line of high water in this jurisdiction is along the upper reaches of the wash of waves, as discussed in *In re Application of Ashford*, 50 Haw. 314, 315, 440 P.2d 76, 77 (1968), and *Sotomura, supra*.

### CONSTITUTIONAL ISSUES

The Sanborns contend that both the Hawaii and federal constitutions would be violated if this court fixes the Sanborns' title line along the upper reaches of the wash of waves. It is contended that such an adjudication would be a taking of private property for public use without just compensation and also, by allegedly denying res judicata to the 1951 decree, would be a violation of due process *per se*.

Under our interpretation of the 1951 decree, we see no constitutional infirmity. The 1951 decree recognized that the Sanborns' title extends to a line "along high water mark". We affirm the holding in *McCandless, supra*, that distances and azimuths in a land court decree are not conclusive in fixing a title line on a body of water, where the line is also described in general terms as running along the body of water.

The Sanborns cite *Muhlker v. New York & Harlem R.R.*, 197 U.S. 544 (1905), wherein the Supreme Court reversed a

decision of the New York Court of Appeals which had attempted to retroactively overrule a prior decision of the same court recognizing the existence of easements of light and air. *Muhlker* is not apposite. As of 1951, neither the Hawaii Supreme Court nor the Hawaii legislature nor Congress had defined high water mark for this jurisdiction, and thus there was no legal definition upon which the land court and the Sanborns could rely. *Cf.* Justice Stewart's analysis in a concurring opinion in *Hughes v. Washington*, 389 U.S. 290, 296 (1967):

> To the extent that the decision of the Supreme Court of Washington . . . arguably *conforms to reasonable expectations*, we must . . . accept it as conclusive. . . . [T]o the extent that it constitutes a sudden change in state law, unpredictable in terms of the relevant precedents, no such deference would be appropriate. (Emphasis added).

The absence of a clear legal standard in 1951 tends to disprove the existence of a reasonable expectation in 1951 that the land court would be able to fix conclusively the distances and azimuths of high water. Moreover, as of 1951 the *McCandless* decision had been standing undisturbed for over 35 years. It would have been unreasonable for the parties to rely on specific distances and azimuths after *McCandless* had held that such measurements are inconclusive.

The Sanborns' answering brief on appeal refers to certain 1951 land court documents in support of the allegation that the 1951 decree's distances and azimuths were originally advocated by the Territory of Hawaii — thus allegedly buttressing the argument that the 1951 measurements must be deemed conclusive as between the appellees and the State. The cited 1951 land court records are not part of the designated record on appeal, but they are original papers in Land Court Application No. 1578 and therefore, as explained *supra* with respect to the 1951 decree, are part of the record on appeal pursuant to HRCP Rule 75(a). The cited records do not support the contention that the 1951 distances and azimuths were intended to effect a binding settlement for

future years. In a Replication dated February 21, 1951, applicant Sanborn accepted under protest the distances and azimuths advocated by the Territory but at the same time stated his understanding that the measurements were subject to change according to seasonal fluctuations (as opposed to the Sanborns' present argument that distances and azimuths may be changed only where there is "permanent" erosion or accretion). Applicant stated:

> That inasmuch as the Territory of Hawaii admits . . . that Applicant's title runs to high water mark, and inasmuch as the high water mark *varies from season to season* depending upon the slope of the beach, it would be wasteful of the Court's time and Applicant's money to request a hearing . . . and have the *Court properly determine* the present *true high water mark* and *delineate the same upon the application* inasmuch as *any such delineation would promptly be varied from month to month* with the shifting of the sands and the slope of the beach and neither the Applicant nor the Territory . . . would gain. . . . (Emphasis added).

This implicit concession that a decree's measurement of high water may be revised to reflect seasonal fluctuations undercuts further any argument that this court's definition of high water mark ("the upper reaches of the wash of waves") was beyond the reasonable expectations of the parties in 1951; for this definition merely reflects normal high tide during that season of the year when the tide reaches furthest inland. In other words, this court's definition of high water mark lies within the range of normal seasonal fluctuations which applicant Sanborn conceded to be proper occasions for revision of the land court decree.

The judgment of the land court is reversed. The "vegetation and debris line", found by the land court to reflect the upper annual reaches of the wash of waves, is the line that the land court should have determined to be the Sanborns' beachfront title line. Upon proper motion by either party, the land court shall amend the decree of registration in accordance with this opinion.

*Andrew S. O. Lee,* Deputy Attorney General *(Russell N. Fukumoto* with him on the briefs) for Respondent-Appellant.

*Alan C. Kay (Case Stack Kay Clause & Lynch* of counsel) and *J. Russell Cades (Cades Schutte Fleming & Wright* of counsel) for Petitioners-Appellees.