JOSEPH SHAFFER, Plaintiff-Appellant, *v.* EARL THACKER CO., LTD., a Hawaii corporation, BARBARA THOMPSON, STEPHEN T. SAWYER, and HARRIET B. SAWYER, aka HARRIET BOUSLOG, Defendants-Appellees, and KING ESCROW SERVICE CORP., a Hawaii corporation, Defendant

NO. 7614

(CIVIL NO. 57588)

AND

EARL THACKER CO., LTD., STEPHEN T. SAWYER, and HARRIET B. SAWYER, aka HARRIET BOUSLOG, Plaintiffs-Appellees, *v.* JOSEPH SHAFFER, Defendant-Appellant

NO. 7946

(CIVIL NO. 57189)

MARCH 8, 1982

HAYASHI, C.J., BURNS, J., CIRCUIT JUDGE CHANG
IN PLACE OF ASSOCIATE JUDGE PADGETT, DISQUALIFIED

OPINION OF THE COURT BY BURNS, J.

This is a consolidated appeal of two cases. In First Circuit Civil No. 57588, Buyer sued Sellers and their brokers, Thacker and Thompson, for the return of the $25,000 he deposited when he contracted to purchase a leasehold lot and a residence thereon and for actual and punitive damages for negligence, misrepresentation, and fraud. In First Circuit Civil No. 57189, Sellers and their broker, Thacker, sued Buyer for permission to keep the $25,000 as liquidated damages and for other damages for breach of contract. In both cases the trial court entered summary judgment against Buyer and he appeals. We perceive genuine issues of material fact and, therefore, we reverse.

Viewed most favorably to Buyer,[1] the facts are as follows: On May 31, 1978, Plaintiff Joseph Shaffer (Buyer) executed a Hawaii Association of Realtors, 1971 form Deposit Receipt, Offer and Acceptance (DROA), wherein he offered to purchase "4157 Blackpoint" (Lot 37C) described as follows: "All that Bishop Estate leasehold property of approximately 25,308 sq. ft. and all improvements located thereon. . . . Tax Map Key 1 Div. 3/5/1/7. . . ."

Defendants Stephen T. Sawyer and Harriet B. Sawyer (Sellers) counter offered, and, after further negotiations, the parties agreed

---

[1] *See Windward Partners v. Lopes*, 3 Haw. App. ____, (No. 7795, February 18, 1982).

on the following terms of sale: $600,000 via $100,000 cash and $500,000 via a 44-month interest only Agreement of Sale (A/S) at 9-1/4% simple interest; Buyer to make annual principal payments of $25,000 on January 10, 1979, January 10, 1980, January 10, 1981, and January 10, 1982; and Buyer entitled to prepay without penalty after January 9, 1979.

The DROA requires Sellers to "furnish Buyer from a licensed Abstractor . . . a Certificate of Title showing good title to the property or the interest to be conveyed vested in Buyer. If Seller fails to deliver title as herein provided, Buyer at his option may terminate this agreement and any deposits shall thereupon be returned to him." It also requires Sellers "to show visible staking of bounderies [sic] or have property staked by surveyor"; provides that "Buyer and Seller shall perform all their obligations set forth herein on or before Sept. 8, 1978" but that the date "may be extended for a period of 30 days at the discretion of the Seller's Broker"; and specifies that "[t]he property is to be conveyed with warranties vesting good title in Buyer, free and clear of all liens and encumbrances, except covenants, easements, reservations and restrictions now of record, if any, which do not materially affect the value of the property. . . ."

Buyer's broker, Penny Bradley, attests that prior to the signing of the DROA, Sellers represented to her and Buyer "that the hollow-tile wall was the Ewa boundary of the [Sellers'] property; that the property included 25,308 square feet, and that there were no encroachments or liens on the [Sellers'] property."

Buyer attests that he "agreed to pay $23.70 per square foot for the . . . property . . . because that price was less than the amount that he was willing to pay for the property. . . ."

Sellers' broker extended the closing to October 9, 1978.

Sometime in September 1978, Sellers' survey showed that the Black Point Association's swimming pool fence encroached upon Lot 37C. The survey also showed that the major portion of the hollow-tile wall was actually within the boundaries of adjoining Lot 38 owned by Alicia Davies. It was then discovered that to solve the hollow-tile wall encroachment problem, Sellers' predecessors in title had, on May 20, 1971, entered into an unrecorded agreement with the owner of Lot 38 whereby the owner of Lot 38 conveyed to Sellers' predecessors in title 1,090 square feet of land and that Bishop Estate, the master lessor, had consented to this boundary adjustment.

By letter dated September 29, 1978, Sellers advised both brokers:

Steve took photographs of the wall and the terrain and consulted with the Planning Division of the City-County to see whether, in the opinion of the official to whom he spoke, the terrain was such that the City would consider the terrain sufficient reason to permit the 701 square feet to be consolidated as a part of Lot 37-C. The representative he spoke to, Mr. Moore, answered his question in the affirmative. He said that it would be necessary on paper to consolidate the two lots and then resubdivide. He said in his opinion a new survey would not be necessary but that we could get Towill Corp. to show the subdivision on paper without the necessity of a new survey of Alicia Davies' lot. Steve then spoke to Mr. Michaels at the Bishop Estate. Mr. Michaels said he thought he would be able to give us a letter permitting us to proceed to get City approval without their requiring a new survey of the Davies lot.

This is desirable because Alicia Davies is, as you know, abroad and we would not be authorized to make a survey of her property without her permission. She is scheduled to return about the middle of October.

Proceeding in the above manner will be the most expeditious. Once the consolidation of the lots and the resubdivision is laid out by the surveyor on paper and sufficient copies prepared for the City, Steve can hand-carry the proposal to the various departments whose signatures are required. The exchange will, of course, require the signature of Alicia Davies.

We will guarantee to the purchasers that we will proceed to enforce the agreement entered into by the Boones and Alicia Davies if it is legally possible to do so. Under the terms of that agreement, as Boones' assignees, we are entitled to enforce it.

If, for some reason not now foreseen or anticipated, the boundary cannot be changed in accordance with the agreement, we will relocate the wall on the exact boundary at our expense.

Since the Shaffers are purchasing under an agreement of sale, with this guarantee and indemnification, it would seem that we could proceed to close under the agreement of sale.

### 2. *Swimming pool enclosure.*

The Towill survey clearly shows that it is the swiming pool area which is encroaching on our property and not visa-versa. At the time the buyer, Mr. Shaffer, is ready to take title to the property, we will, if he so desires, require the pool association to correct the encroachment. That decision will be up to him. We will not disturb the situation at this time.

### 3. *The meander vegetation line marked by the Towill survey.*

I spoke with Attorney Clinton Ashford to confirm my views as to the practice and general procedure followed by all owners of waterfront property in Hawaii. He agrees that the general practice and wisest practice is not to make any change in the waterfront boundary of any property unless it is necessary to do so in order to get a building permit within the 40-foot setback. The greatest value of the Boone property is the fact that it is not subject to this setback. The change in the location of waterfront was made by Hawaii's Supreme Court in judicial decisions. The question is still pending in several federal court cases and the final validity of the Hawaii Supreme Court decision setting the vegetation line has not yet been finally determined. Moreover, the vegetation line changes from year to year. The practice is to add to any deed "subject to judicial determinations from time to time of the location of the shore boundary."[2]

I also spoke to Surveyor Cline Mann whom I regard as one of Hawaii's most expert surveyors. He says that he regards the above practice as the only practicable solution for waterfront land owners: that is, to leave the boundary as stated in the Bishop Estate leaseholds or whatever lands are owned privately in fee until such time as they are required to change it, which is not so in this case. Mr. Mann points out also that in connection with Black Point, which is practically a solid rock waterfront, there has been no real determination as to rock-formed shore line.

---

[2] If such language is not part of the DROA, by what authority is it added to the deed? The problem in this case is that the DROA does not contain such language nor does the DROA authorize its insertion into the A/S or the Assignment of Lease.

If, at the time when they are ready to take title, the Shaffers desire to have the vegetation line determined and to take title only to what it is at the time they take title, we will have it surveyed for them so they can do so.

So long as we hold title, however, we will not make any change in the waterfront as it would be neither to our interest nor to the buyer's interest to do so.

With our guarantee that we will exhaust all legal means to acquire the portion within the wall and the explanation as to the other two points, there should be no reason why we cannot close with these conditions expressed in our agreement.

(Footnote added.)

By letter dated October 6, 1978, Buyer's broker, Penny Bradley, advised Defendant King Escrow Service Corporation (Escrow):

As soon as Mrs. Davies returns and escrow has received her signed statement that she is in agreement to this, Mr. Shaffer will proceed to close with the understanding that the Sellers will continue to do all that is necessary on the consolidation of the lots resubdivision and recordation of the new boundary line with the Bureau of Conveyances in the State of Hawaii.

Thereafter, the parties were informed that a consolidation and resubdivision was not possible without the State of Hawaii's consent and that the State, in reliance upon *In Re Sanborn,* 57 Haw. 585, 562 P.2d 771 (1977); *County of Hawaii v. Sotomura,* 55 Haw. 176, 517 P.2d 57 (1973); and *In Re Application of Ashford,* 50 Haw. 314, 440 P.2d 76 (1968), would permit a consolidation and resubdivision only if the seaward boundary was adjusted to the vegetation line which would result in a loss of approximately 3,800 square feet from the 25,308 square feet which Buyer had agreed to purchase.

In consequence of these developments, Buyer, via letter dated December 13, 1978, notified Sellers that he decided to terminate the agreement and wanted his deposit back. Sellers refused. Thereafter, Sellers filed suit for permission to keep the $25,000 deposit and for damages, and then Buyer filed suit for the return of his $25,000 deposit, for actual and punitive damages against Sellers for fraud and misrepresentation, and for damage against Sellers' brokers, Thacker and Thompson, for their "negligence and misrepresentations."

Sellers responded to the complaint in Civil No. 57588 with a Rule

12(b)(6), Hawaii Rules of Civil Procedure, motion to dismiss, which, because matters outside the pleadings were considered by the court, was converted into a Rule 56, Hawaii Rules of Civil Procedure, motion for summary judgment. The lower court granted the motion in favor of Sellers; it later extended the summary judgment to operate in favor of Sellers' brokers, Thacker and Thompson; and thereafter it granted summary judgment in favor of Sellers in Civil No. 57189. Buyer appealed all the summary judgments.

By stipulation and order, Escrow has been dismissed from this case.

At the lower court level, the focus of this case was on the encroachment problems. However, it appears that but for the seaward boundary problems, the encroachment problems were solvable. Consequently, our focus is on the seaward boundary problems.

Sellers argue that they are not required to deliver "good title" until Buyer pays in full. We disagree. An agreement of sale conveys equitable title. *Jenkins v. Wise*, 58 Haw. 592, 574 P.2d 1337 (1978). Thus, the DROA required Sellers at closing to execute and deliver an agreement of sale which conveyed "good [equitable] title." Upon satisfaction of the A/S, Sellers were required to deliver "good [equitable and legal] title." Moreover, even assuming Sellers' argument has some validity, once the title problems became apparent, Buyer was entitled to adequate assurance of Sellers' ability to furnish the title which the DROA required them to furnish first upon closing and then when the A/S is paid off (which could have been any time after January 9, 1979). *Romig v. de Vallance*, 2 Haw. App. 597, 637 P.2d 1147 (1981).

We are dealing with a situation where there was a dispute between the State and the Sellers over the ownership of 3,800 square feet of "approximately 25,308 sq. ft." which Sellers agreed to sell and Buyer agreed to buy. Although they promised to do so, it appears that Sellers would have been unable at closing to convey "good [equitable] title" to 15% of the property to Buyer. It further appears that Sellers were unable to give adequate assurance of their ability upon satisfaction of the A/S to convey to Buyer "good [equitable and legal] title." That inability, if material,[3] would have been a repudia-

---

[3] *Golf Carts, Inc. v. Mid-Pacific Country Club*, 53 Haw. 357, 493 P.2d 1338 (1972).

tion of the A/S. *Romig v. de Vallance, supra.* Under the circumstances, Buyer may have been justified in terminating the DROA and asking for his money back. *Continental Developers v. Hensel,* 57 Haw. 570, 650 P.2d 1306 (1977); 17 AM. JUR.2d, *Contracts,* § 358 (1964).

Turning to the fraud issue, Penny Bradley attests that "[o]n many occasions prior to the signing of the DROA, [Sellers] represented to [Buyer] and herself . . . that there were no encroachments or liens on the [Sellers'] property." If Sellers were aware of the encroachment problems or the seaward boundary (adverse claim) problems when they made those representations and then they entered into the DROA without informing Buyer of those problems, then Buyer may have a valid cause of action for fraud under *Kang v. Harrington,* 59 Haw. 652, 587 P.2d 285 (1978); *Hong Kim v. Hapai,* 12 Haw. 185 (1899); and 37 AM. JUR.2d, *Fraud and Deceit,* § 89 (1968).

Sellers have inserted into the record a Policy of Title Insurance dated May 9, 1977, which Sellers obtained when they acquired Lot 37C. That policy states:

This policy does not insure against loss or damage by reason of the following:

.    .    .    .

4. Location of the seaward boundary in accordance with the law of the State of Hawaii.

The policy is evidence relevant to the material question whether Sellers were aware of the seaward boundary (adverse claim) problems when they entered into the DROA.

Accordingly, the summary judgment is reversed and this matter is remanded for further proceedings consistent with this opinion.

*Jeffrey Daniel Lau (Fong & Miho* of counsel) for plaintiff-appellant.

*Clyde Wm. Matsui* for defendants-appellees, Thacker and Thompson in No. 7614.

*Michael L. Freed* and *Earl T. Sato (Hamilton, Gibson, Nickelsen, Rush & Moore* of counsel) for defendants-appellees, Sawyers in No. 7614 and plaintiffs-appellees in No. 7946.