Mervin NAPEAHI, et al., Plaintiffs,

v.

Michael WILSON, etc., Defendants.

Civil No. 85–01523 DAE.

United States District Court,
D. Hawaii.

Oct. 7, 1996.

Alan T. Murakami, Carl C. Christensen, Native Hawaiian Legal Corp., Honolulu, HI, for Plaintiffs.

Margery S. Bronster, Atty. General, Edwin P. Watson, Wayne A. Matsuura, Deputy Attys. General, Department of the Attorney General, State of Hawaii, Honolulu, HI, for Defendants.

## ORDER ADOPTING MAGISTRATE'S FINDINGS AND RECOMMENDATION

DAVID ALAN EZRA, District Judge.

A Findings and Recommendation having been filed and served on all parties on September 5, 1996, and

No objections having been filed by any party,

IT IS HEREBY ORDERED AND ADJUDGED that pursuant to Title 28, United States Code, Section 636(b)(1)(C) and Local Rule 404–2, the Findings and Recommendation is adopted as the opinion and order of this Court.

## FINDINGS AND RECOMMENDATION

YAMASHITA, United States Magistrate Judge.

On February 14, 1986, Plaintiff filed a complaint alleging that 1.75 acres of a tidal pond area of land was abandoned by the State to the private property landowner which constitutes a breach of Hawaii's ceded lands trust. On October 20, 1986, after a six day bench trial the District Court concluded that the disputed tidal pond area was situated within the private property boundaries of the Defendant, thus not part of the ceded lands. Upon appeal to the Ninth Circuit, the case was remanded to the District Court to determine whether the acreage in question naturally became submerged land by erosion. The Ninth Circuit further stated that if it did, then it would have become land subject to the terms of the trust and the land would have been improperly abandoned in violation of the terms of the trust. If not, then it

remained private land and there was no breach of trust.

On September 5, 1995, the Honorable David A. Ezra, United States District Judge designated this matter to the Magistrate Judge for a review of the record and a determination of whether a evidentiary hearing will be required regarding the remanded issue.

On September 7, 1995, this court held a hearing and informed the parties that this Court would review the record. Pursuant to Rule 63 of the Federal Rules of Civil Procedure, this court ordered submissions from both parties that would direct this court's attention to the appropriate evidence in the record. This court informed the parties that its submissions would be considered arguments. On September 21, 1995, Plaintiff filed a response to this court's order. On September 29, 1995, Defendant filed a memorandum on evidentiary hearing on remand. For the reasons stated below, this court finds that the property became naturally submerged land by erosion after 1898 and before the physical alteration of the area by the property owners. However, the type of remedy that can be awarded to Plaintiff must be determined after separate briefing on the issue.

## BACKGROUND

This action concerns 1.75 acres of tidal land (the "Property") along the Kona Coast of the Island of Hawaii. The State of Hawaii ("Defendant"), under the act that admitted it to statehood, holds certain lands in trust for particular uses and purposes. Section 5(f) of the Hawaii Admission Act, 73 Stat. 4, 6 (1959). One of those purposes is "for the betterment of the conditions of native Hawaiians." *Id.* Such lands are commonly referred to as "ceded lands." In this action, Plaintiff contends that the property is not part of the private parcel of land but instead is "ceded lands" subject to the terms of public trust under the Hawaii Admission Act.

In 1976, the Department of Land and Natural Resources ("DLNR") for the State of Hawaii, pursuant to new regulations requiring shorelines to be certified for zoning and setback purposes, certified the shoreline at

Waialua Bay (where the tidal lands are located) indicating that the disputed tidal pond area was situated seaward of the shoreline. However, in 1984, at the urging of the holders of the Kalama Patent who wished to develop the area, the state agency recertified the shoreline concluding that the disputed tidal pond area fell landward of the coastal boundary. After successfully moving for recertification, the holders of the Kalama Patent applied for and received a dredge and fill permit authorizing development of the tidal lands. The present action originally was brought in an attempt to block blasting and dredging of the tidal pool area, but, after injunctive relief was denied, the property was graded and developed as planned. The property is now occupied by the Hyatt Regency Waikoloa Hotel (the "Hotel"). Plaintiff contends that the DLNR breached the trust by ceding the property to the Hotel.

After a six day bench trial, the Honorable Harold M. Fong, United States District Judge, held that the property was private property, and entered judgment for Defendant. The court held that the property was not submerged land in 1898, and therefore, was not subject to the trust. The court did not make a finding as to whether the property became submerged land after 1898 due to natural erosion of the seashore.

In *Napeahi v. Paty,* 921 F.2d 897 (9th Cir.1990), the Ninth Circuit held that Napeahi did have standing, and upheld the court's finding that the property was not submerged land in 1898. However, the appellate court held that the property could have become trust land if it had become submerged land due to natural erosion after 1898, and before the property was altered by the owners. Therefore, the appellate court remanded this case for a factual finding on whether the land became submerged land after 1898 and any appropriate judgment or declaratory relief.

## ISSUE ON REMAND

The District Court must determine whether the property in question naturally became submerged land by erosion within the meaning of *Ashford, Sotomura,* and *Zimring* after 1898 and before the physical alteration of the area by the property owners. If the property did, then it would have become land subject to the terms of the trust and the land would have been improperly abandoned in violation of the terms of the trust. If not, then it remained private land and there was no breach of trust.

## DISCUSSION

### I. Evidentiary Hearing on the Remanded Issue

On August 24, 1995, Defendant moved for an evidentiary hearing on the remanded issue. Plaintiff opposed such a hearing. This court finds that an evidentiary hearing on the remanded issue is not necessary in this case. Upon a review of the transcripts of the six day bench trial, this court finds there is ample evidence in the record to allow this court to determine the central issue on remand. This court notes that both parties had ample opportunity to make their record at the first trial. To conduct a new trial would result in prejudice to the Plaintiff because he would have to bear the costs of additional litigation. Accordingly, this court cannot find that an evidentiary hearing would assist the court in determining the remanded issue. Further it would not appear that a evidentiary hearing was within the contemplation of the Ninth Circuit's order upon remand.

### II. Historical background of Hawaii shoreline boundary cases and a review of the history of the instant case

This court has done an extensive review of the origin and scope of shoreline boundary cases in Hawaii. An overview is necessary to fully understand the historical background of this case and to explain and to define certain laws, terms and concepts that are exclusive to the issues presented in this case. The Hawaii Supreme Court has thoroughly detailed the history and procedures followed in establishing the title and boundaries of land after the Great Mahele. *See State By Kobayashi v. Zimring,* 58 Haw. 106, 566 P.2d 725, 729–31 (Haw.1977). The Ninth Circuit has adopted the *Zimring* court's summary of the historical background in shoreline boundary cases in the appeal of this case, *Napeahi v. Paty,* 921 F.2d 897 (9th Cir.1990). This court finds that a historical review of shoreline boundary cases in Hawaii is necessary in

order to understand the issues in the present case.

The theory of private ownership of land was a foreign concept in Hawaiian history. Initially, all Hawaiian land was owned collectively by the people of Hawaii and held in trust for their benefit by the King. *In re Boundaries of Pulehunui*, 4 Haw. 239–241, 242 (1879) and J.J. Chinen, *The Great Mahele* 5 (1958).

The contact of western civilization brought vast changes to the Hawaiian land tenure system. In 1840, King Kamehameha III, the reigning monarch at the time, undertook a reformation of the traditional system of land tenure by instituting a regime of private title. *See* J. Wise, "The History of Land Ownership in Hawaii," in *Ancient Hawaiian Civilization* 85 (1965); and M. Kelly, *Changes in Land Tenure in Hawaii*, 1778–1850 (1956) (unpublished thesis available in University of Hawaii Library). A massive land division, entitled the "Great Mahele," ensued. *Id.* Under the Great Mahele, the land of Hawaii was divided into three separate categories. *Id.* and *See* Melody Kapilialoha MacKenzie, *The Native Hawaiian Rights Handbook*, 3–20 (1991). The King retained certain lands for his private use, set aside certain lands for the government, and distributed the remaining tracts to private individuals. *Id.*

In 1845, the Board of Land Commissioners was created in order to implement the new land tenure system. L. Thurston, *The Fundamental Law of Hawaii* 3 (1904) and *The Native Hawaiian Rights Handbook*, 3–20 (1991). The Board of Land Commissioners established a two tier process to gaining title to land in Hawaii. *See In re Boundaries of Pulehunui*, 4 Haw. 239, 240 (1879). First, a recipient was required to apply to the Land Commission to obtain the actual award of land. *Id.; Napeahi v. Paty*, 921 F.2d 897 (9th Cir.1990). However, the number and size of the tracts of land distributed pursuant to the Great Mahele were enormous, that no body of surveyors could have surveyed these large estates within the lifetime of the grantees. *See In re Boundaries of Pulehunui*, 4 Haw. 239, 240 (1879). As a result the original transfers of land were made in name only without a description of boundaries. *Id.; Napeahi*, 921 F.2d at 899. Upon the completion of a survey to procure a more precise

description of the land that the grant encompassed, an application could be made to the Commissioner of Boundaries to obtain a definitive determination of the scope of the award. *Id.* A recipient would receive a Royal Patent upon the completion of the survey which determined the boundaries of the land and defined by the Commissioner of Boundaries. *Id.*

In 1895, American citizens residing in Hawaii overthrew the Kingdom of Hawaii and established the Republic of Hawaii. *See The Native Hawaiian Rights Handbook*, 3–20 (1991). The Republic of Hawaii claimed title to all those lands designated as Government Lands at the time of the overthrow and all lands held by the monarchy. *See The Native Hawaiian Rights Handbook*, (citing to W.A. Russ, Jr. *The Hawaiian Republic* (1894–1898), 33–34 (1961)).

On August 12, 1898, the Republic of Hawaii ceded sovereignty of the islands to the United States under the terms of the Joint Resolution of Annexation. *See The Native Hawaiian Rights Handbook*, at 15 (citing Joint Resolution of Annexation of July 7, 1898, 30 Stat. 750). The Republic conveyed absolute title of Hawaii's public lands to the United States. *Id.* These lands included both the government lands and the monarch lands. *Id.* The Joint Resolution stated in part that the revenue or proceeds from the government or monarch lands shall be used solely for the benefit of inhabitants of the Hawaiian Islands for educational and other public purposes. *Id.*

In 1940, the Hawaii Supreme Court expanded the definition of public lands. The Hawaii Supreme Court held that properties, which became public lands, included all submerged lands surrounding each island to one marine league seaward (three miles). *See Bishop v. Mahiko*, 35 Haw. 608, 642–45 (1940). The Republic, subsequently, ceded all public lands (including submerged land) to the United States pursuant to the Treaty of Annexation of 1897 and the Joint Resolution of Annexation of 1898, 30 sat. 750. *Id.* In 1959, when Hawaii became a State, these "ceded lands" (except for certain land occupied by the United States Government) were returned to the State of Hawaii to be held in

public trust for the people under the Hawaii Admission Act of 1959. *Id.* Section 5(f) of the Admission Act requires the state to hold all ceded lands, with limited exceptions:

[A]s a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians, for the development of farm and home ownership on as widespread basis as possible, for the making of public improvements, and for the provision of lands for public use. Such lands, proceeds, and income shall be managed and disposed of for one or more of the foregoing purposes in such manner as the constitution and laws of said State may provide, and their use for any other object shall constitute a breach of trust for which suit may be brought.

Admission Act of March 18, 1959, Pub.L. No. 86–3 § 5(f), 73 Stat. 5.

The instant case arises from one of the land transfers that occurred under the Great Mahele. King Kamehameha III awarded to his wife, Queen Kalama, the ili (an ili is an ancient Hawaiian unit of land) of Anaehoomalu on the Island of Hawaii. *Napeahi v. Paty,* 921 F.2d at 899–902. Queen Kalama followed the procedure outline above and obtained both a Certificate of Boundary and a Royal Patent covering of ili of Anaehoomalu grant. *Id.* Prior to receiving the Certificate of Boundary and a Royal Patent, Queen Kalama had the area of ili Anaehoomalu surveyed in an attempt to establish a more precise description of its boundaries. *Id.* A surveyor by the name of J.S. Emerson, surveyed the land and submitted his notes and map to the Commissioner of Boundaries for the Island of Hawaii. *Id.*

At trial of the instant case, there was considerable dispute as to whether the certification of the Commissioner and in turn, the Royal Patent, actually incorporated Emerson's metes and bounds description of the shoreline or whether the patent simply left the seaward boundary to be defined as the high water mark. *Id.* The District Court determined, and the Ninth Circuit affirmed, that there was ample basis to conclude that the location of the seaward boundary, as reflected in government surveyor's Emerson's metes and bounds description was the high water mark derived in the traditional

Hawaiian manner, and therefore, the seaward boundary. *Id.*

Upon appeal of the instant case, the Ninth Circuit, however, adopted the Hawaii Supreme court's holding in *County of Hawaii v. Sotomura,* 55 Haw. 176, 517 P.2d 57, 61 (1973), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). The *Sotomura* court held that the seaward boundary of ocean front property can change through erosion, resulting in the State acquiring title to the newly eroded submerged lands. *Id.* The court stated that "the precise location of the high water mark on the ground is subject to change and may always be altered by erosion." *Id.* The court further held that, when the seaward boundary changes inland by erosion, the State owns and may obtain title to the additional submerged land that results. *Id.* The Hawaii Supreme court in *State By Kobayashi v. Zimring,* 58 Haw. 106, 566 P.2d 725 (1977), dealt with the issue of whether the resulting additional state-owned land constitutes "ceded" land subject to the trust provisions pursuant to Section 5(f) of the Hawaii Admission Act of 1959. In the *Zimring* case, the issue was over the title to land that had been newly created on the seashore as a result of lava flow. The Hawaii Supreme Court concluded that lands newly created by lava flow became state lands subject to the terms of the public trust. *Zimring,* 566 P.2d at 739.

The Ninth Circuit applied the *Zimring* principle to the instant situation to hold that the terms of the public trust apply where the seaward boundary has changed due to submersion of private property. *Napeahi,* 921 F.2d at 902. The Ninth Circuit stated that there is no reason to distinguish the inchoate property interest in submerged land that could be acquired by the State as a result of erosion from that which could be acquired by a lava extension. According to the Ninth Circuit, both were inchoate property interests which *Zimring* held to be property that was ceded to the United States and then returned to the State in 1959. *Id.* at 903. According to the Ninth Circuit, it is reasonable to conclude from *Sotomura* and *Zimring* that if the 1.75 acres in the instant case became submerged lands because of natural

erosion after 1898 and before being altered by the actions of the property owner, then that property would be ceded lands subject to the terms of the trust. *Id.*

The Ninth Circuit remanded this case to the District Court for a determination on whether the property became submerged lands by natural erosion. The District Court designated the remanded issue to this court. This court is charged with the task of making a recommendation to the District Court on the remanded issue of whether the acreage in question naturally became submerged land by erosion after 1898 and before the physical alteration of the area by the property owners. If it did, then it would have become land subject to the terms of the trust and the land would have been improperly abandoned in violation of the terms of the trust. If not, then it remained private land and there was no breach of trust.

### III. The property became submerged land by erosion after 1898

From September 5, 1986 through September 12, 1986, The Honorable Harold M. Fong, United States District Judge, held a six day bench trial in the instant case. One of the key issues at trial was whether the disputed tidal basin area was connected to the waters of Waialua Bay by a natural channel or opening. Throughout the six day bench trial, both parties presented extensive evidence on the issue of submersion. Upon a review of the trial transcript and evidence, this court finds that the property naturally became submerged land by erosion after 1898 and before the physical alteration of the area by the property owners. In arriving at this decision, this court finds that the witnesses for Plaintiff were credible in their assessment of the condition of the property prior to any physical alteration. Additionally, the evidence admitted at trial supports a finding that a natural channel existed prior to any physical alteration of the property.

### A. Plaintiff's case at trial

Plaintiff presented numerous witnesses attesting to the existence of a natural channel connecting Waialua Bay and the disputed tidal basin area since the 1950's. Plaintiff's presented the testimony of Alex Williams ("Williams"), Jay Whiteford ("Whiteford"), Walter Puhi ("Puhi"), Dr. William Barrera, Jr. ("Barrera"), and Mervin Napeahi ("Napeahi"). All of these witnesses testified that the tidal pools on the property were connected to the open waters of Waialua Bay and during high tide the property would become submerged. This court finds that the testimony of witnesses Williams, Whiteford, Puhi, Barrera and Napeahi are credible. This court will engage in a detailed discussion of the testimony and evidence presented in support of this finding.

#### 1. Testimony of Alex Williams

Plaintiff's first witness, Williams, has been a professional photographer for forty years. From the 1969 to 1978, Williams took photographs for Boise Cascade, a previous owner of the property. Plaintiff's Exhibits 5A, 5B, 6–11, and 13 are photographs that Williams took during his employment with Boise Cascade. According to Williams, all of the photographs that he took are a fair and accurate representation of the coastline in and around Waialua Bay in the Anaehoomalu area on the dates of each photograph. TR 9/05/86 at 82. Based upon his observations while taking the photographs, Williams testified that he saw marine life in the area within the same time period that the photographs were taken. TR 9/05/86 at 87–88. Specific types of marine life observed by Williams, included a barracuda, baby moi, aholehole, moana, medaka, humuhumunukunukwapua'a, and a general display of reef fish. TR 9/05/86 at 87–91. Williams also testified that the tidal pools were connected to the open waters of Waialua inlet. TR 9/05/86 at 91. On cross examination, Williams testified that he didn't notice any natural barriers blocking the flow of water between the tidal pools and the open waters. TR 9/05/86 at 94.

#### 2. Testimony of Jay Whiteford

Plaintiff's next witness, Whiteford took aerial photographs of the area and compiled topographic maps from those pictures. At trial, Whiteford was qualified as an expert in the area of photogrammetry. Through the aerial photographs predating any physical alteration of the property, Whiteford affirmed that his examination of the property revealed that there was considerable amount of water in the tidal ponds, a lot of water

through the entrance, and no sign of any natural barrier. TR 9/11/86 at 147–148. Whiteford used a stereoscope to analyze Defendant's Exhibits 26–30. Defendant's Exhibits 26–30 are aerial photographs of the property that were taken between December 18, 1964 and December 4, 1970. Utilizing the stereoscope, Whiteford testified that there is a drainage pattern throughout the tidal pond which draws the conclusion that the water would flow in and out of the tidal pond. TR 9/05/86 at 122–123. Specifically, Whiteford testified that the water flowed between the tidal pond and the Waialua inlet between the lava flow and the sandbar. *Id.* at 126. Whiteford, however, testified that it is difficult to determine the shoreline on the property using Defendant's Exhibits 26–30 because all the photographs seem to have been taken at low tide. *Id.* at 118.

Whiteford also testified regarding Plaintiff's Exhibits 5A and 5B. Plaintiff's Exhibits 5A and 5B are photographs taken of the property on November 6, 1969. According to these photographs, Whiteford opined that, during high tide, the tidal ponds were filled with water. TR 9/05/86 at 146. Whiteford stated that "a group of rocks or a small rocky island out in the bay shows that it's pretty well surrounded and nearly covered by water; the same two photographs shows a considerable amount of water in the tidal basin." *Id.* Whiteford testified that at low tide the rocky island could be seen even though the major ponds were still filled with water. *Id.* at 148. According to Whiteford, Plaintiff's Exhibit 6, a photograph of the property taken on December 11, 1970 is evidence of this fact. *Id.* Whiteford opined that there was no formidable barrier blocking the flow of water and referred to Plaintiff's Exhibits 5A and 5B as support. *Id.* at 147–148. Whiteford concluded that prior to any bulldozing at the mouth of the entrance of the channel to the tidal basin area the water flowed freely back and forth into the tidal pond without artificial interruption. *Id.* at 151–152. Based upon Whiteford's testimony, this court finds that Plaintiff's Exhibits 5A, 5B, and 6, are a accurate depictions of the tidal ponds during both high and low tide.

### 3. *Testimony of Walter Puhi*

To further support his argument, Plaintiff called Puhi to testify. Puhi was born and raised on the Island of Hawaii and frequented the Waialua Bay area on regular overnight fishing trips with his father and was familiar with the tidal basin area. TR 9/08/86 at 172. Puhi testified that between the ages of twelve and fourteen, in 1963–64, he made weekend trips to the property with his father and became familiar with the tidal patterns in the area. According to Puhi, during the times he was there before 1969, as the tides came in, water naturally filled in the tidal basin area through the inlet. *Id.* at 176. Puhi also testified to seeing fish in the tidal basin area; specifically, he saw manini, uwouwo (phonetic), mullet, barracuda, moi, and uhu. *Id.* at 174.

Puhi was also familiar with the area because he once assisted Mr. George Higa in surveying the area for the state of Hawaii Survey Division of the Department of Accounting and General Services on August 17, 1971. *Id.* at 182. Higa's notes revealed that the natural shoreline should have included a delineation along the tidal basin areas because it was connected by an open channel to the ocean. Plaintiff's Exhibit 14. *Id.* at 184.

### 4. *Testimony of Dr. William Barrera, Jr.*

Another witness called to verify Plaintiff's position was Barrera, an archaeologist who observed the property before any construction activity disturbed the natural features of the tidal basin area. Barrera's testimony corroborates the testimony of Williams, Whiteford, Puhi and Napeahi. Barrera testified that during 1969 through 1970, he conducted an archeological survey and excavation in the surrounding area for a period of seven months. TR 9/08/86 at 198. His work was necessarily done before any construction altered the terrain in the area. *Id.* Because of the nature of his profession, his field work would have been impossible once any features were disturbed. Barrera testified that there was a low area in a pahoihoi [1] [sic] lava flow which had become filled with water from the ocean. *Id.* at 201–202. According to

---

1. This court is aware of the difference between pahoehoe lava and a'a lava. Both are lava formations. Pahoehoe lava is the smooth lava and a'a lava is the porous lava. Both of these terms have been recognized in the field of geology.

Barrera, the water would seep in through the underground and through a channel which came in from the end of Waialua Bay. *Id.* Barrera testified that he had observed the area during all tidal conditions, saw tidal waters flowing into the tidal basin area, and had to walk around the basin to cross over the natural channel when it was filled with ocean waters. *Id.* at 202–203. Barrera also authenticated Plaintiff's Exhibits 5A, 5B, 7, 8, 9, and 11, all which were photographs that depicted the natural conditions of the Bay at the times of his observations, before construction between 1969 and 1970. *Id.* at 204–206. Barrera concluded his testimony by stating that there was no natural rock barrier that separated the tidal pond area from the rest of the inlet. *Id.* at 206. During cross examination, Barrier testified that during high tide, he couldn't cross over one land mass to another because the water was about one to two feet deep. *Id.* at 209.

### 5. Testimony of Mervin Napeahi

The last witness to testify in Plaintiff's case in chief was Plaintiff Mervin Napeahi. Napeahi, born in 1940 and raised on the Island of Hawaii, testified that there was a natural channel which connected the Waialua Bay and the disputed tidal basin area since the 1950s. TR 9/10/86 at 57–58. Napeahi stated that between the ages of four and twelve he would go fishing with his Dad in the tidal ponds. *Id.* Napeahi recalls water in the tidal pond being connected to the rest of the Bay. *Id.* The water could be anywhere from one to three feet deep, and during high tide the water could go past his head (Napeahi was a child at the time he observed the tidal ponds). *Id.* at 62. At the time of his observations, Napeahi did not see any evidence of bulldozing. *Id.* at 58.

Plaintiff's rebuttal witness, Dr. Richard Moore, an expert in the area of geology opined that the geology of the property was relatively stable. Moore testified that the volcanic a'a flow on the north side of the Bay was probably 750–1500 years old. TR 9/11/86 at 142. Moore also believed that the pahoehoe law flow that dominates the tidal basin area and extends out to the ocean was 4,000 years old. *Id.* at 141. Moore opined that there was no major climatic events that might have altered the conditions of Waialua Bay. *Id.* at 146. Accordingly, his expert

opinion was that over the last 100 years, geologic changes to the area was minimal. *Id.* at 147. Therefore, he did not believe that a natural barrier across the inlet to the tidal basin area ever existed. *Id.* at 148–149. Upon examination of the area, he found no inlet could have been blocked given the deepness of the water off the north end of the sand bar and absence of evidence of sand movement. *Id.* at 149.

### 6. Testimony of Willis Sanburn

During Plaintiff's case in chief, defense witness, Willis Sanburn ("Sanburn") conceded that his observations of the tidal basin area was based on living on the Island of Hawaii for only three months. TR 9/10/86 at 78–79. Sanburn's first and only observation of the conditions at Waialua Bay was in the summer of 1970 and he only went down to the tidal ponds approximately six to twelve times. *Id.* at 78 and 104. While Sanburn claimed there was a natural barrier across the channel connecting the tidal basin area to the ocean, he could not swear that he saw that natural barrier at high tide. *Id.* at 86.

Additionally, during cross examination, Sanburn testified that the illegal construction of the roadway over the channel to the tidal basin area triggered a county citation. In particular, Sanburn described how the county told him to put a culvert in, in order to allow fish to pass back and forth. *Id.* at 87. This testimony draws the conclusion that the county's own concern appeared to be that a previously existing passage way for fish that existed across that channel be maintained.

Sanburn also testified that the United States Army Corps of Engineers instructed the private land owner to remove the illegal fill in the tidal ponds. According to the documentary evidence that was admitted at trial, the U.S. Corps of Engineers believed that a natural channel existed at the time of the illegal fill being placed in the waters of Waialua Bay. *See* Plaintiff's Exhibits 19 and 21. In two letters from Col. Edelstein to Sanburn, dated October 17, 1973 and June 30, 1974, the Army Corps directed the private owner to remove the illegal fill material that had cutoff apparent regular tidal flow between the ocean and the tidal pond area. Furthermore, in Sanburn's November 12,

1973 response letter to Col. Edelstein, Sanburn never challenged the premise that there was regular tidal flow or inundation at high tide into the tidal basin area. *See* Plaintiff's Exhibit 82. After receiving the letters from the U.S. Army Corps of Engineers, Sanburn testified that he realized that they put in a road that they shouldn't have. TR 9/10/86 at 100. Sanburn established that he knew of no other bulldozing activity that could have affected the natural conditions of the tidal basin channel to the ocean before 1970. *Id.* at 116.

In reviewing the totality of the evidence, this court finds that the weight of the evidence overwhelmingly favors a finding that the property became naturally submerged after 1898. According to the testimony of Napeahi, Puhi, Williams, Whiteford, Barrer, and Moore, the tidal ponds were submerged lands. This court finds no reason to doubt the credibility of these witnesses. This court finds that the testimony and the documentary evidence admitted at trial, supports the conclusion that there was a natural channel connecting Waialua Bay and the disputed tidal basin area since the 1950s. The testimony and evidence that Defendant offered at trial fails to rebut the preponderance of evidence submitted by the Plaintiff that the tidal ponds were submerged lands. A careful review of the testimony and evidence of Defendant leads this court to no other conclusion.

### B. *Defendant's case in chief*

In support of the defense, State Land Surveyor, Kazutaka Saiki ("Saiki") testified. Saiki was responsible for verifying shoreline maps for certification for the state of Hawaii. Saiki testified that during a 1984 site inspection of the tidal pool lands, a dispute between the landowner and state officials as to ownership of the tidal pool land arose. TR 9/09/86 at 58; TR 9/11/86 at 46–56. The landowners related to the state their opinion that the tidal ponds were within their private property boundary as delineated in the 1972 File Plan Map 1256. *Id.* and *see* Defendant's Exhibit 7. Saiki testified that state officials required the landowner's representatives to present sufficient proof that the alteration of the shoreline was due to man made activity and not due to natural erosion. TR 9/09/86;

TR 9/11/86. Saiki also testified that in a Sea Grant Advisory Report entitled "Aquatic Survey of the Kona Coast Ponds, Hawaii Island," dated April, 1974, by Richard E. Brock, the subject tidal pools were created by bulldozing activity that occurred in 1971. *Id.*

Another defense witness, Joseph Vierra, testified that the shoreline at the Waialua Inlet prior to the installation of the roadway and culvert in 1971 and at the time of the 1976 shoreline certification was different and, therefore, the landowner submitted aerial maps to State officials to show that the difference in the shoreline was caused by the construction activity. *Id.*

According to the defense witness, Saiki and Vierra, it was the position of the state in 1984, that if the landowner could prove that the subject tidal pools were in fact, once private lands and, further, that no erosion or subsidence occurred to the property, but rather, the alterations to the natural terrain were the result of man-made alterations, due to bulldozing, then the state did not have a claim to the disputed tidal pools.

According to Saiki and Vierra, the landowners did prove to the satisfaction of state officials through aerial photos, a review of land documents, and the testimony of representatives of the former and present landowners that the disputed tidal pools were once private property. TR 9/09/86; TR 9/11/86. Based upon the landowners representations, the state concluded in the 1984 survey that the natural terrain of the property had been altered due to bulldozing activity to put in a service roadway and a culvert in 1971.

After a careful review of the testimony of Saiki and Vierra, this court finds that said testimony is unreliable and questionable. Saiki admitted that as a state surveyor he routinely approved surveys of shorelines based on photographs provided by privately-hired surveyors. TR 9/09/86 at 8. According to Saiki, the state during the period in question never really had any written guidelines concerning how to look for a shoreline based on the particular definition of a shoreline. *Id.* It was not the state's policy to get involved in drawing survey maps of shorelines.

*Id.* at 26. As a result, shoreline certifications were not uniformed during the time in question. *See* Testimony of Haruo Shigeoka, TR 9/10/86 at 42. This court finds that the inconsistencies of the state's action in surveying the shoreline calls into question the accuracy of the shoreline regarding the disputed property.

The testimony of Saiki revealed that in 1976, the landowner's surveyor, George Higa, together with state survey office person Ruichi Kuba, established the certified shoreline which included the tidal basin as submerged lands. *Id.* at 51–52. On this basis, Saiki certified the shoreline as depicted in Plaintiff's Exhibit 91. This certified shoreline generated no controversy and was routinely approved. *Id.* at 53–54.

Subsequently, in 1984, AtPac Land Company and/or Transcontinental Development Company filed a second shoreline certification request. *Id.* at 57. In that application, the private survey firm Engineers Surveyors Hawaii requested a realignment of the shoreline that effectively delineated a shoreline across the mouth of the natural channel that once existed makai of the tidal basin area. Plaintiff's Exhibits 40–41. The state initially denied the request. *Id.* at 58.

However, Saiki testified that on the basis of unsubstantiated allegations of Vierra, a representative of the landowner, Saiki concluded that the bulldozing had removed the natural barrier across the mouth of the tidal basin. *Id.* at 66. Saiki then approved a new certified shoreline that crossed over the mouth of the basin. *Id.* This court finds that Saiki's decision to re-certify the shoreline was not based upon unbias documentation and evidence. First, Saiki relied primarily on a revised file plan of the 1972 survey and secondarily on aerial photographs to reach his new conclusion. *Id.* In addition, he never asked the surveyor who prepared the 1972 map whether a natural channel allowed sea water to flow between Waialua Bay and the tidal basin area. *Id.* at 73.

This court finds that Saiki also relied on his misunderstanding of Hawaii Supreme Court decisions governing determinations of shorelines. Saiki mistakenly believed that shorelines could be drawn across open ocean waters, like mouths of channels to tidal basin areas. *Id.* Saiki did not have any evidence in 1984 that a fishpond wall existed on which he could base his conclusion about the location of the shoreline in this area. *Id.*

This court finds that although Saiki relied in part on aerial photographs to make his determination in 1984 that a natural barrier existed in the channel to the tidal basin area, that his use of the photographs is questionable. Saiki is not a photogrametrist, unlike Whiteford. Nor did he retain one to assist him to analyze photographs of the property. Instead he relied strictly on his own untrained eye to detect the barrier in those photographs. *Id.* at 97. Saiki did not even use a stereoscope or attempt to get the necessary two photographs in sequence to capture a three-dimensional effect from those photographs. *Id.* at 98. Saiki admitted to knowing that these photographs were available to him, but did not seek to obtain them. *Id.*

More importantly, in the photographs that Saiki did rely on, he failed to ascertain whether the photographs were taken at low or high tide, unlike Whiteford. *Id.* at 99. Vierra, in his testimony, states that the photographs he submitted to Saiki may not have been taken at high tide. TR 9/08/86 at 244 – 245. Additionally, this court finds that Saiki presumed that a natural sandbar existed across the natural channel, based solely on representations by the landowner's agents. TR 9/08/86 at 113 – 114. Moreover, Saiki failed to verify Vierra's representations that bulldozing had removed the natural barrier in 1972. *Id.* at 115. Saiki admitted that he did not do an independent investigation into the issue and did not check with an unbiased witness. *Id.* at 117. Vierra, in his testimony admitted that the bulldozing activity occurred in 1972 and 1976. This court finds that if Saiki had done an independent investigation regarding the alteration of the property, he would have found evidence to indicated that in 1969, when no bulldozing had been done, the property was submerged.

Lastly, this court finds that Saiki should not have relied upon the 1972 statement of the landowner's surveyor, Jerry Nakagawa, who attested to the accuracy of the original shoreline determination. *Id.* at 116. Naka-

gawa is of questionable motive and his testimony is internally inconsistent. First, this court notes that Nakagawa was a private survey who represented the interest of the private landowner. Second, Nakagawa's own testimony is shaky because, he stated that even if a high tide created an inlet he would have still designated a shoreline across that inlet, even if water would pass over that inlet. Nakagawa concluded that if an area was exposed to low tide, which would have otherwise served as a passageway to the tidal pond during high tide he would still draw the shoreline at that point.

Nakagawa's reasoning is against the Hawaii Supreme court's holding in *Application of Ashford,* 50 Haw. 314, 452, 440 P.2d 76 (1968). According to the *Ashford* court, the location of a public and private boundary dividing private land and public beaches was along the upper reaches of the waves as represented by the edge of vegetation or the line of debris. *Id.,* 440 P.2d at 78. Thus, this court finds that if Saiki's reliance on Nakagawa's testimony is misplaced.

The remainder of Defendant's evidence fails to support a finding that the property did not become submerged lands after 1898. Defendant argues that the 1968 Field Survey and the 1971 survey found the tidal pool as being situated within the boundary of the private property. *See* Defendant's Exhibit 7. This court finds this evidence to be irrelevant. Under the Ninth Circuit holding in *Napeahi* 921 F.2d at 902 the state owns and may obtain title to the additional submerged land. Under the holding of *Sotomura,* a private boundary can change through erosion and result in addition to the submerged public land. *See Hawaii v. Sotomura,* 55 Haw. 176, 517 P.2d 57, 61 (1973), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). Thus, even if a survey determines the land to be private, it doesn't dispel a finding that the land wasn't submerged.

Additionally, this court finds that the evidence places in doubt the location of the shoreline on the private property during the 1960s and 1970s. Several state and private surveyors testified that the state did not have any written guidelines concerning the finding of a shoreline and would make recommendations for shoreline certification on reports issued by private land surveyors. *See* Testimony of Kazutaka Saiki, TR 9/09/86 at 19, Testimony of Haruo Shigeoka, TR 9/10/86 at 42. Evidence was also presented that indicated that private surveyors used different determinations for shorelines. One such determination was the limu line which is generally much lower in elevation then the debris line and the reaches of the waves at high tide. *See* Testimony of Kazutaka Saiki, TR 9/09/86. According to Haruo Shigeoka, the shoreline certification historically was not uniformed. TR 9/10/86 at 42. Additionally, there was testimony that the state did not do independent surveys of the shorelines on the outer island. *See* Testimony of James Detor, TR 9/09/86 at 205. The state didn't get involved in drawing survey maps of the shoreline. *See* Testimony of Saiki, TR 9/09/86 at 26. Thus, the state would make recommendations for certification on the basis of reports by private surveyors on behalf of the property owner. *Id.* On these grounds, this court finds reason to question the credibility of the surveys and the reliance of these surveys conducted by the state.

Lastly, Defendant argues that the record is sufficient to support a finding that the 1.75 acres tidal pool lands became submerged lands after 1898 due to the physical alteration of the subject area in 1971 by the landowners. However, the weight of the testimony does not support such a finding. The testimony of Napeahi, Puhi, Whiteford and Williams all state that the disputed area was submerged lands during the 1960s. Both Napeahi and Puhi fished the area during 1960s. Williams testified that in 1969 the tidal pool were connected to the open waters of Waialua inlet and that there was marine life in the pools. TR 9/05/86 at 79–88. Barrera testified that during 1969–1970, the tidal pools would fill with water so much so that he couldn't cross from one land mass to another because the water was too deep. TR 9/08/86 at 209. Barrera also testified that the bulldozing that was done to the property did not affect the tidal pond area. This court finds that all of the evidence presented by Plaintiff to support a finding that tidal pools were natural submerged predates that time when the state contends that bulldozing altered the property resulting in it being submerged. Therefore, Defendant's argument

that physical alteration of the property created the submerged lands is without merit.

Accordingly, this court finds that the preponderance of the evidence weighs in favor of the Plaintiff. The testimony and documentary evidence supports the conclusion that the property became submerged lands after 1898 and before any physical alteration by the private owner.

## IV. *Appropriate judgment or declaratory relief*

Plaintiff is a trust beneficiary who is seeking to make the Defendant, the trustee, conform to his trust duties. This court in finding that the land became submerged land through natural erosion, also finds that Defendant breached its duty to the beneficiaries. The District Court has already ruled on the types of relief available to Plaintiff.[2] The District Court held that any relief sought that is retrospective is barred by the Eleventh Amendment. However, in the instant case, the District Court, held that Plaintiff prays for an injunction to force the State to attempt to recover the property—a prospective injunctive remedy that is allowable under the case law. The District Court also held that if the State fails to recover the property, it will not be forced to use its own funds to replenish the trust corpus.

Defendant has argued in the past that (1) giving the property to the Hotel was not a breach of trust because the Hotel's use benefits the public; and (2) that even if the trust was breached, injunctive relief is not appropriate because Hawaii has passed laws to seek to compensate native Hawaiians for past breaches of trust. Plaintiff countered that any evidence of any public use by the Hotel is not properly before the court because it is not in the trial record, and that the Hotel's use of the property is not a proper use of trust assets.

The District Court, however, deferred consideration of those issues until after a finding on whether the land ever became submerged land through erosion after 1898. The District Court held that if the court makes that finding in the affirmative, it would then consider whether the trust was breached or whether injunctive relief is appropriate.

The designation to this court did not include the issue of damages. Accordingly, the parties have not briefed these issues for this court. Should the District Judge want a findings on these issues, this court would request further briefing and submit its findings in a separate Findings and Recommendation.

### CONCLUSION

Based on the foregoing, this court finds that an evidentiary hearing on the remanded issue is not necessary. Additionally, this court finds that Plaintiff has proven by a preponderance of the evidence that the property became submerged lands after 1898 and before any physical alterations by the private owner. This court cannot make a finding regarding the remedies available to Plaintiff until a decision of the District Judge on the remanded issue.

IT IS SO FOUND AND RECOMMENDED.

September 5, 1996.

Entry of Judgment After Remand, Or, In The Alternative, For 28 U.S.C. § 1292(B) Certification.

---

**2.** *See* The Honorable Harold M. Fong, United States District Judge, October 26, 1996 Order Denying Defendant's Motion For Dismissal or